| | | |
|---|---|---|
| NORTH CAROLINA | ) | IN THE GENERAL COURT OF JUSTICE |
| | ) | SUPERIOR COURT DIVISION |
| ALAMANCE COUNTY | FILED | 23 CVS ___741___ |

FILED
2023 APR 13 P 4:29
ALAMANCE CO., C.S.C.
BY_____

| | |
|---|---|
| MAURICE WELLS, JR. | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) COMPLAINT |
| | ) |
| SHERIFF TERRY S. JOHNSON, in his | ) |
| Official Capacity as Sheriff of Alamance | ) |
| County, North Carolina | ) |
| | ) |
| Defendant. | ) |

## PARTIES

1. Plaintiff Maurice Wells, Jr. ("Mr. Wells") is a citizen and resident of Greensboro, Guilford County, North Carolina.

2. Defendant Terry S. Johnson ("Sheriff Johnson") is the elected Sheriff of Alamance County, North Carolina, and a citizen and resident of Alamance County, North Carolina.

3. Sheriff Johnson, as Alamance County's chief law enforcement officer, is a "person" within the meaning of and subject to suit under 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

4. This court has personal jurisdiction over defendant pursuant to N.C. Gen. Stat. § 1-75.4 (2022) and original jurisdiction over all claims pursuant to N.C. Gen. Stat. §§ 1-253, 7A-240, and 7A-245 (2022).

5. Venue is mandatory in Alamance County pursuant to N.C. Gen. Stat. § 1-77(2) (2022), as the instant action is filed against the Alamance County Sheriff, who is a public officer, in his official capacity, for acts done by him by virtue of his office.

1

Case 1:23-cv-00427-CCE-LPA   Document 4   Filed 05/26/23   Page 1 of 18

# FACTUAL ALLEGATIONS

6. On 11 July 2020, Rev. Gregory Drumwright and Justice for the Next Generation organized a peaceful Black Lives Matter ("BLM") demonstration in downtown Graham, in Alamance County, North Carolina, to protest police violence. The demonstration took place near the Confederate monument displayed outside the Alamance County Courthouse. The Plaintiff in this action, Mr. Wells, participated in the demonstration.

7. The BLM demonstration included a roster of speakers who addressed the participants from a stage located in the middle of North Main Street, next to Sesquicentennial Park. The 2,500-square-foot public park was founded in 1999 to commemorate the 150th anniversary of Alamance County. The park has benches, greenery, and a structure that houses a 400-pound bell that previously sat atop the original courthouse in Graham.

8. During the BLM protest, a group of counterprotesters gathered on the northwest corner of Sesquicentennial Park. Among the counterprotesters were members of a group called Alamance County Taking Back Alamance County ("ACTBAC"), including its founder Gary Williamson, Jr. and his father, Gary Williamson, Sr. ACTBAC is a Confederate heritage group.

9. For the duration of the BLM protest, the ACTBAC counterprotesters rang the old courthouse bell in Sesquicentennial Park. (Ex. A 32:4-25, 37:10-12.)

10. The bell ringing interfered with the ability of the BLM demonstrators to hear the speakers.

2

11.     Officers from the Alamance County Sheriff's Office ("ACSO") who were at the scene neither instructed the counterdemonstrators to stop ringing the bell during the BLM demonstration nor directed them to disperse during the BLM protest. (Ex. A 32:23-25, 33:1-4.)

12.     While the BLM demonstration was winding down before 3:00 p.m., some BLM demonstrators began ringing the old bell in support of their message protesting police violence. Mr. Wells rang the bell and simultaneously sang the chorus of the 1979 Anita Ward disco song, "Ring My Bell."

13.     Mr. Wells' ringing and singing prompted the Williamsons to complain to ACSO personnel. The Williamsons asked ACSO to compel Mr. Wells to stop ringing the bell and to leave the park.

14.     ACSO personnel called Sheriff Johnson and requested that he come to Sesquicentennial Park to talk to the protesters gathered around the bell. (Ex. A 7:1-4; Ex. B.) He arrived at around 2:50 pm. (Ex. B.)

15.     When Sheriff Johnson arrived at the park, he observed the Williamsons and other counterprotesters arguing with the BLM protesters, including Mr. Wells. (Ex. A 7:17.) Sheriff Johnson heard Mr. Wells ringing the bell (Ex. A 10:11-12) and informing the ACTBAC members, including the Williamsons, that, "this is our motherfucking bell," and "I am going to ring the motherfucking bell," (Ex. B; Ex. A 10:19-20.) Sheriff Johnson also heard the Williamsons and other ACTBAC counterprotesters using similar language to address the BLM protesters. (Ex. A 27:23-25.)

3

16. At this point, the Williamsons again demanded that ACSO personnel remove Mr. Wells from the scene. Sheriff Johnson approached Mr. Williamson, Jr., put his arm around his shoulder, and stated, in pertinent part, "[l]ook, you need to leave. This is going to get out of hand." (Ex. A 8:2.) Sheriff Johnson also told Mr. Williamson, Jr. that he would go to jail if he did not leave and that he was "not playing around." (Ex. A 8:6-7.)

17. When Mr. Williamson, Jr. moved away from Sheriff Johnson, Mr. Williamson, Sr. approached him. (Ex. A 8:15.) Sheriff Johnson then told Mr. Williamson, Sr. to leave. (Ex. A 8:16.) Ultimately, Sheriff Johnson personally told the Williamsons to leave several times. (Ex. A 9:15.)

18. The Williamsons did not comply with any of Sheriff Johnson's directives to leave (Ex. A 27:5-16) and remained at the park until after Mr. Wells' arrest. (Ex. A 9:24-25, 25: 9-10, 33:12-21.) Sheriff Johnson did not arrest either of the Williamsons on 11 July 2020. (Ex. A 27:17-19.)

19. After speaking to Mr. Williamson, Sr., Sheriff Johnson turned to Mr. Wells. He said, "Son, quit ringing the bell or you're going to jail. It's time to disperse." (Ex. A 8:19-21.) Mr. Wells informed Sheriff Johnson that he intended to continue singing and ringing the bell in peaceful protest and stated, "take me to fucking jail." (Ex A 9:2-3.)

20. Sheriff Johnson then reached for and grabbed Mr. Wells' arms and stated, "Okay, you are under arrest." (Ex. B.) He pulled Mr. Wells away from the bell and out of the crowd. (Ex. A 9:3-4.)

4

21. By announcing his intention to arrest him, seizing his arms, and physically moving him out of the crowd, Sheriff Johnson personally arrested Mr. Wells on 11 July 2020. Mr. Wells submitted to the authority of Sheriff Johnson and did not resist his efforts to arrest him.

22. At Sheriff Johnson's direction, Officer Kayla Belk of the Graham Police Department took Mr. Wells into custody with the assistance of ACSO Deputies Kenneth Brown and Mark Dockery. (Ex. A 25:7-9; Ex. B; Ex. C.)

23. Following Mr. Wells' arrest, protesters recorded video of Sheriff Johnson telling members of the public who were at the scene that Mr. Wells had been arrested because he used language that "was not decent." (Cell Phone Video 1 at 01:17.) Standing next to Sheriff Johnson, Deputy Brown explained the arrest by stating, "He was told numerous times to watch his language." (Cell Phone Video 1 at 00:55; Ex. A 41:5; 43-19-20.)

24. In a later video in which Sheriff Johnson gave reasons for Mr. Wells' arrest, he said, "You cannot cuss. You can't 'F this' and 'F that.' That is disorderly conduct." (Cell Phone Video 2 at 00:12.)

25. At Mr. Wells' trial, Sheriff Johnson asserted that Mr. Wells had incited a fight. (Ex. A 31:18.)

26. Mr. Wells did not touch anyone, get close to touching anyone, or appear likely to engage in any violent physical confrontation with the Williamsons or anyone else in the park. (Ex. A 42:8-10.) Mr. Wells' speech was not directed at any particular individual. (Ex. A 41:16-23.)

5

27. Sheriff Johnson was the constitutionally elected Sheriff of Alamance County, North Carolina, when he personally arrested Mr. Wells on 11 July 2020. In his capacity as the county's chief law enforcement officer, Sheriff Johnson was, at all times relevant to the allegations of this complaint, the final policymaker for Alamance County regarding all law enforcement matters, including his direct involvement in the arrest of Mr. Wells.

28. Mr. Wells was the only person arrested at the demonstration at Sesquicentennial Park in Graham on 11 July 2020. Specifically, Mr. Wells was charged by the State with Disorderly Conduct (N.C. Gen. Stat. § 14-288.4) and Failure to Disperse (N.C. Gen. Stat. § 14-288.5).

29. Pursuant to N.C. Gen. Stat. § 14-288.5(a), a dispersal order must be "given in a manner reasonably calculated to be communicated to the assemblage."

30. The ACSO has attributed the alleged dispersal orders to different ACSO personnel. Sheriff Johnson claims to have issued dispersal orders in his trial testimony and investigative report. (Ex. A 9:13-22; Ex. B.) The Magistrate's Order lists Deputy Dockery as the officer whose dispersal commands Mr. Wells disobeyed. (Ex. C.)

31. Two witnesses at Mr. Wells' trial who were present at the park on 11 July 11 testified that they did not hear an order to disperse either before or after his arrest. (Ex. A 54:18-23, 78:6-10.) One of these witnesses, Pamela Chestek, was acting as a legal observer to monitor police conduct under the aegis of the National Lawyers Guild.

32. Sheriff Johnson and Deputy Brown testified at Mr. Wells' trial in Alamance County District Court. No officer from the Graham Police Department appeared or testified at Mr. Wells' district court trial.

33. Mr. Wells was summarily found guilty of the two misdemeanor charges on 24 March 2021, in a ruling announced from the bench by District Court Judge Lunsford Long. *State v. Wells* (Alamance County 20 CR 53112). Mr. Wells' appeal *de novo* to Superior Court is currently pending and awaiting a court date.

## FIRST CLAIM FOR RELIEF
(First Amendment Violations-42 U.S.C. § 1983)

34. Plaintiff realleges the allegations contained in paragraphs 1-33 of the complaint, which are incorporated by reference herein as if the same were fully set forth.

35. The plaintiff, Mr. Wells, was deprived of his constitutional rights of free speech and assembly by the defendant, Sheriff Johnson.

36. Sheriff Johnson was the constitutionally elected Sheriff of Alamance County, North Carolina, and was acting under color of state law when he came to Sesquicentennial Park on 11 July 2020 and arrested Mr. Wells.

37. North Carolina General Statute § 15A-401(c)(1) (2022) establishes that an arrest is completed when "the person submits to the control of the arresting officer who has indicated his intention to arrest." Sheriff Johnson's personal actions, which included announcing his intention to arrest Mr. Wells, seizing his arms, and physically moving him out of the crowd, were sufficient to constitute a complete arrest.

7

38. In Alamance County, Sheriff Johnson is the ultimate policymaker for the county regarding matters of law enforcement. In that capacity, Sheriff Johnson's direct decisions and personal actions establish an official policy actionable under § 1983.

39. By unlawfully suppressing Mr. Wells' protected speech and arresting him, Sheriff Johnson's actions on 11 July 2020 deprived Mr. Wells of his First Amendment right to speak and engage in expressive conduct in a public forum during and following the BLM demonstration.

40. Sheriff Johnson's actions are evidence of a practice or policy to disfavor the speech of people of color when applying and enforcing the law in Alamance County.

41. Mr. Wells was arrested by the old courthouse bell in Sesquicentennial Park. Like all public parks, which "time out of mind, have been used for the purposes of assembly, communicating thoughts between citizens, and discussing public questions," *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992), Sesquicentennial Park is a traditional public forum. Consequently, the government "has a high burden in justifying speech restrictions relating" to conduct in the Park. *Id.*

42. When he was arrested, Mr. Wells was ringing the old courthouse bell, which was expressive conduct. He intended to convey at least two messages: (1) that the public forum consisting of Sesquicentennial Park and its bell are not within the exclusive dominion and control of the Williamsons, ACTBAC, or their message of

paying homage to the former Confederacy; and (2) that Sesquicentennial Park and its bell also can be used to convey and highlight political messages supportive of the BLM demonstrators. These messages were objectively likely to be understood by a reasonable observer under the circumstances. As such, the bell ringing was expressive conduct that constituted political speech on matters of public concern rendered in a public forum and is fully protected by the First Amendment.

43. When he was arrested, Mr. Wells was engaged in protected speech by singing the chorus to "Ring My Bell," which consists of the following repeated phrase: "You can ring my bell, ring my bell." This lyric has no language that removes it from the protection of the First Amendment—it is neither obscene nor libelous; it does not incite others to commit violent acts; and it does not contain direct personal insults likely to immediately provoke acts of violence by the person to whom, individually, the insults are addressed. In the context in which the singing took place, the lyrics supported and emphasized the political message conveyed by Mr. Wells' bell ringing. The singing was therefore political speech on matters of public concern rendered in a public forum and was fully protected by the First Amendment.

44. Mr. Wells also engaged in protected speech when he used the words "motherfucking" and "fucking" in his interactions with counterprotesters and Sheriff Johnson. Mr. Wells told ACTBAC members "This is our motherfucking bell," and "I am going to ring the motherfucking bell." In this context, the word "motherfucking" is impassioned rhetoric that conveys the depth of Mr. Wells' commitment to using the bell to express his political message. He did not direct the term at the

9

counterprotesters or use it as a personal epithet. Similarly, when Mr. Wells told Sheriff Johnson to "take me to fucking jail," the word "fucking" expressed the intensity of Mr. Wells' feelings about his imminent arrest. He did not direct the word at Sheriff Johnson nor use it as a personal epithet. In this context, "motherfucking" and "fucking" are not obscene, libelous, fighting words, or incitement, but instead are speech fully protected by the First Amendment.

45. After he was arrested and taken into custody, Mr. Wells was no longer able to ring the bell, to sing "you can ring my bell, ring my bell" to onlookers, or to verbally engage with counterprotesters. Sheriff Johnson thereby deprived Mr. Wells of his First Amendment right to speak on matters of public concern in a public forum.

46. On information and belief, Mr. Wells' arrest was part of a pattern and practice in which ACSO suppressed the rights of protesters to speak on matters of public concern following the death of George Floyd in May, 2020. On 26 September, 2020, ACSO deputies again arrested Mr. Wells while he was exercising his First Amendment rights in the area around the Courthouse, and again charged him with Disorderly Conduct, along with Resisting a Public Officer and Injury to Personal Property. *State v. Wells* (Alamance County 20 CR 054378). In another case that arose in part out of ACSO's response to protests in Graham in 2020, the Middle District of North Carolina federal court ruled in 2020 that Alamance County and ACSO's policy of barring protesters' access to the area surrounding the historic Alamance County Courthouse likely violated their First Amendment rights. Memorandum Opinion and Order at 16, *NAACP v. Peterman*, No. 1:20-CV-613 (M.D.N.C. Aug. 14, 2020). The

10

court granted a preliminary injunction blocking ACSO from prohibiting all protests in those spaces. *Id.* As part of the consent order later issued by the court in that case, Sheriff Johnson agreed that "the use of 'swear' or 'indecent' words is protected by the First Amendment and is not lawful grounds for arrest." Consent Order and Judgment at 9, *NAACP v. Peterman*, No. 1:20-CV-613 (M.D.N.C. April 21, 2021). ACSO also agreed to participate in training on racial bias and racial equity by 24 September, 2021. *Id.*

47. Sheriff Johnson also retaliated against Mr. Wells for exercising his First Amendment rights when he arrested him on 11 July, 2020, on charges of failure to disperse and disorderly conduct.

48. The First Amendment limits North Carolina's disorderly conduct statute to the prohibition of fighting words, defined as "words tending to cause an immediate breach of the peace willfully spoken in a public place." *State v. Summrell,* 282 N.C. 157, 168, 192 S.E.2d 569, 576 (1972), *overruled on other grounds sub nom*, *State v. Barnes*, 324 N.C. 539, 380 S.E.2d 118 (1989). Accordingly, the Supreme Court of North Carolina construed the statute to reach only "words and conduct likely to provoke ordinary men to violence." *Id.* at 167, 192 S.E.2d at 575-76. Furthermore, the statute itself requires that the language be "*intended* and *plainly* likely to provoke violent retaliation . . . ." N.C. Gen. Stat. § 14-288(a)(2) (emphasis added).

49. Speech, like Mr. Wells', that is merely vulgar or profane, clearly does not amount to disorderly conduct in North Carolina.

11

50. Similarly, North Carolina's failure to disperse statute, which is aimed at forestalling riots, is limited by the First Amendment, which narrowly defines incitement as words intended to cause imminent lawless behavior. *State v. Brooks*, 287 N.C. 392, 401, 215 S.E.2d 111, 118 (1975). Even assuming *arguendo* that Sheriff Johnson issued an order to disperse to Mr. Wells, such an order was an invalid and unlawful police command lacking in probable cause because there were no objectively reasonable grounds—consistent with the federal Constitution—to believe that Mr. Wells' speech and expressive conduct were inciting an imminent riot or were likely to do so. Thus, no probable cause existed to have arrested Mr. Wells for the underlying criminal charges, considering Mr. Wells' constitutionally protected political speech.

51. The North Carolina Supreme Court has held that an appeal as of right from an "inferior" trial court to a "superior" trial court "completely annul[s]" the inferior court's judgment. *State v. Sparrow*, 276 N.C. 449, 507, 173 S.E.2d 897, 902 (1970).

52. Because Mr. Wells has appealed his convictions to Superior Court, the District Court's findings of fact and conclusions of law are entitled to no deference.

53. Mr. Wells was arrested after voicing his social and political views through bell ringing, singing, and passionate expressions of his commitment to certain political and social causes. Mr. Wells' speech and expressive conduct were protected by the First and Fourteenth Amendments.

54. Mr. Wells' protected speech was a substantial or motivating factor in Sheriff Johnson's decision to arrest him. Sheriff Johnson's political interests as

12

Alamance County Sheriff were served by suppressing Mr. Wells' speech because his message contradicts the views of a sizable portion of Sheriff Johnson's political voting base. *But for* this retaliatory motive to silence Mr. Wells, Sheriff Johnson would not have arrested him. Therefore, Sheriff Johnson's action amounted to an unlawful retaliatory arrest.

55. Even assuming *arguendo* that probable cause existed to arrest Mr. Wells on the two misdemeanor charges, this does not defeat his retaliatory arrest claim because the similarly situated Williamsons were not arrested. If the facts objectively indicate that a plaintiff was arrested where similarly situated individuals not engaged in the same sort of protected speech were not, "probable cause does little to disprove the causal connection between animus and injury." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019). Thus, in such cases probable cause does not defeat a retaliatory arrest claim.

56. Sheriff Johnson's personal relationship with the similarly situated Williamsons and sympathy for their political message led him to treat them differently from Mr. Wells. Sheriff Johnson is personal friends with the Williamsons and coached Mr. Williamson, Jr. in football at Southern Alamance High School. He illustrated his solidarity with and support for ACTBAC through, for example, the physical gesture of putting his arm around the group's founder, Mr. Williamson, Jr. Sheriff Johnson declined to arrest anyone from ACTBAC on 11 July 2020, indicating a policy of tolerance for the group and its message. The ACTBAC members expressed their political message by ringing the old bell for several hours during the BLM

13

Case 1:23-cv-00427-CCE-LPA   Document 4   Filed 05/26/23   Page 13 of 18

demonstration without any comment, interference, threat of or actual arrest by ACSO personnel. With respect to Mr. Wells, however, Sheriff Johnson has commented, upon information and belief, that "I ain't gonna take him to my house and go out and eat with him, but I like the boy." Mr. Wells is a 36-year-old man.

57. The political messages accompanying Mr. Wells' bell ringing were different from and opposed to ACTBAC's bell ringing during the BLM demonstration. Sheriff Johnson tolerated and accommodated the bell ringing of ACTBAC. The Williamsons and other ACTBAC counterprotesters remained in Sesquicentennial Park even after Sheriff Johnson told them to leave several times. They also used profane language to address Mr. Wells and other BLM protesters. Consequently, the facts objectively indicate that Mr. Wells was arrested because Sheriff Johnson disliked and would not accommodate the content of his political message and not because he remained in Sesquicentennial Park, rang the bell, sang, stated that he would continue to ring the bell, or used words like "fucking" and "motherfucking."

58. The ACSO has typically exercised its discretion not to arrest protesters for conduct similar to that of Mr. Wells on 11 July 2020. On information and belief, bell ringing, singing, and the use of colorful language are rarely, if ever, the basis of an arrest by Sheriff Johnson and ACSO for failure to disperse and disorderly conduct. Hence, even if probable cause existed to arrest Mr. Wells, Sheriff Johnson impermissibly exploited his power to arrest as a means of suppressing the content of Mr. Wells' political speech.

59. The disparate treatment of the Williamsons and Mr. Wells also constituted impermissible viewpoint discrimination. As described in paragraphs 56-58, Mr. Wells was arrested for disorderly conduct and failure to disperse for remaining in Sesquicentennial Park and engaging in protected political speech, whereas the Williamsons were not arrested despite using profane language and remaining in the park after Sheriff Johnson told them to leave. Mr. Wells' conduct is only distinguishable from that of the Williamsons in terms of its political content. Thus, in this instance, Sheriff Johnson impermissibly discriminated against Mr. Wells' speech because of its viewpoint.

## SECOND CLAIM FOR RELIEF
(Declaration of Rights-N.C. Gen. Stat. §§ 1-253 and 42 U.S.C. § 1983)

60. Plaintiff realleges the allegations contained in paragraphs 1-59 of the complaint, which are incorporated by reference herein as if the same were fully set forth.

61. Mr. Wells asks the Court for a declaratory judgment with respect to his constitutional rights under the First Amendment and Fourteenth Amendments to the U.S. Constitution pursuant to 42 U.S.C. § 1983, N.C. Gen. Stat. §§ 1-253, 7A-245(a)(4) (2022), and Rule 57 of the North Carolina Rules of Civil Procedure.

62. Under these statutes, this Court has the jurisdiction and authority to declare rights, status and other legal relations, whether or not further relief is or could be claimed, and such declaration shall have the force and effect of a final judgment or decree. The Declaratory Judgment Act must be liberally construed and administered by the courts of this state.

63. An actual, justiciable controversy currently exists between the parties because Sheriff Johnson improperly suppressed—indeed stopped—Mr. Wells' protected speech by arresting him on 11 July 2020.

64. The U.S. Constitution does not preclude contemporaneous criminal and civil proceedings, and "in the absence of substantial prejudice to the rights of the parties involved, [parallel civil and criminal] proceedings are unobjectionable under our jurisprudence." *Lee v. McDowell*, 19 CVS 17741, 2021 WL 4168383 at *3 (N.C. Sup. Ct. Sept. 21, 2021) (quoting *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1374 (D.C. Cir. 1980)).

65. Mr. Wells' participation in the 11 July 2020 demonstration was not an isolated event, and without a declaration that his arrest was improper, Mr. Wells is uncertain as to how he can exercise his constitutional rights when speaking and acting during future protests.

66. Accordingly, Mr. Wells respectfully requests that Court, under 42 U.S.C. § 1983, and pursuant to N.C. Gen. Stat. §§ 1-253, 7A-245(a)(4) (2022) and Rule 57 of the North Carolina Rules of Civil Procedure, to declare that the suppression of plaintiff's political speech and plaintiff's arrest by Sheriff Johnson on 11 July 2020 on charges of disorderly conduct and failure to disperse constituted unconstitutional suppression and retaliation in violation of plaintiff's freedom of speech protections guaranteed by the First and Fourteenth Amendments to the United States Constitution.

**WHEREFORE,** plaintiff respectfully prays the court that:

1. Declare under 42 U.S.C. § 1983, N.C. Gen. Stat. §§ 1-253, 7A-245(a)(4) (2022) and Rule 57 of the North Carolina Rules of Civil Procedure, that the suppression of plaintiff's political speech and plaintiff's arrest by Sheriff Johnson on 11 July 2020 on charges of disorderly conduct and failure to disperse constituted unconstitutional suppression and retaliation in violation of plaintiff's freedom of speech protections guaranteed by the First and Fourteenth Amendments to the United States Constitution;

2. The costs of this action, including reasonable attorney's fees, be taxed against defendant should plaintiff prevail pursuant to 42 U.S.C. § 1988(b);

3. This action be tried by a jury on all issues so triable; and

4. The court grant such other and further relief as shall be just and proper.

Respectfully submitted, this the 13th day of April 2023.

NELSON MULLINS RILEY & SCARBOROUGH LLP

*Cory Patterson/SL*

Cory Patterson
N.C. State Bar No. 39973
One Wells Fargo Center
301 South College Street
23rd Floor
Charlotte, NC 28202
Phone 704.417.3154
cory.patterson@nelsonmullins.com

*Lorin J. Lapidus/SL*

Lorin J. Lapidus
N.C. State Bar No. 33458
Phone: 336.774.3329

lorin.lapidus@nelsonmullins.com
Chelsea K. Barnes
N.C. State Bar No. 53378
380 Knollwood Street, Suite 530
Winston-Salem, NC 27103
Phone: 336.774.3397
chelsea.barnes@nelsonmullins.com

FIRST AMENDMENT CLINIC AT DUKE LAW SCHOOL

*/s/ Sarah Ludington*

Sarah Ludington
N.C. State Bar No. 19997
ludington@law.duke.edu
C. Amanda Martin
N.C. State Bar No. 21186
amartin@law.duke.edu
Telephone: 919.613.7048
Fax: 919.613.7262
210 Science Drive
Durham, NC 27708