IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:23-cv-427-CCE-LPA

MAURICE WELLS, JR.,

Plaintiff

v.

SHERIFF TERRY S. JOHNSON, in his
Official Capacity as Sheriff of Alamance
County, North Carolina,

Defendant

**PLAINTIFF'S MEMORANDUM IN
SUPPORT OF MOTION
FOR SUMMARY JUDGMENT**

## INTRODUCTION

Plaintiff, Maurice Wells, Jr., attended a protest in Graham, North Carolina. At the end of the protest, Wells joined other protesters in ringing the old courthouse bell in Sesquicentennial Park. While Wells was speaking, singing, and ringing the bell, Sheriff Terry Johnson, of the Alamance County Sheriff's Office ("ACSO"), arrested him. Sheriff Johnson testified in the district court trial, where Wells was found guilty of disorderly conduct and failure to disperse. *State v. Wells*, No. 20-CR-53112, (Alamance Cty. Dist. Ct. Div. 2021) Summary Judgment Motion Exhibit A ("Trial Tr."). Wells has appealed that conviction and has sued Sheriff Johnson in his official capacity under 42 U.S.C. § 1983 for violation of his First Amendment rights. Wells seeks a declaration that his arrest abridged his First Amendment rights of speech and assembly.

Wells moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. Wells is entitled to summary judgment on his claims, because the undisputed facts show that Sheriff Johnson, while acting under color of state law, abridged Wells' First Amendment rights to speak

1

and assemble. Because Wells' speech did not constitute fighting words, and there was no valid dispersal order, Sheriff Johnson's arrest of Wells was unconstitutional.

## UNDISPUTED FACTS

On July 11, 2020, Plaintiff Maurice Wells participated in a Black Lives Matter ("BLM") protest in Graham, North Carolina, near the Alamance County Courthouse and Sesquicentennial Park. DE 11, Answer ¶¶ 6–7. Within the park was an old bell ("the monument") that once sat atop the original courthouse in Graham. DE 11, Answer ¶ 7.

During the BLM protest, a group of counterprotesters gathered in the same vicinity. DE 11, Answer, ¶ 8. Among the counterprotesters were Gary Williamson, Sr. and Gary Williamson, Jr. Along with other members of a group called Alamance County Taking Back Alamance County ("ACTBAC"), a group Sheriff Johnson described as being opposed to bringing down the monument. Deposition of Sheriff Johnson, 18:22–25; 19:2–6, Summary Judgment Motion Exhibit B ("Johnson Dep."). Sheriff Johnson was familiar with ACTBAC and the Williamsons. Johnson Dep. 18:12–25. Throughout the BLM protest, ACTBAC counterprotesters rang the old courthouse bell. Trial Tr. 32:4–6, 32:23–25, 33:1–4; ASCO Deputy Dockery Case Suppl. Report, Summary Judgment Motion Exhibit C ("Dockery Case Suppl. Report") (Counterprotesters were "incessantly ringing a large bell").

As the demonstration was winding down, Mr. Wells was one of the BLM demonstrators who rang the old bell. Trial Tr. 8: 18-19.  While he rang the bell, Wells sang the Anita Ward song, "Ring My Bell." DE 11 Answer, ¶ 12. ACSO personnel requested Sheriff Johnson come to Sesquicentennial Park, and he arrived around 3:05 p.m. Sheriff Johnson Suppl. Report, Exhibit B to Complaint (" Johnson Suppl. Report").

2

When he arrived, Defendant observed counterprotesters, including the Williamsons, arguing with BLM protesters, including Wells. Trial Tr., 7:12–17. Sheriff Johnson reported that he heard Plaintiff ringing the bell and yelling, "I am going to ring the mother fucking bell." Johnson Suppl. Report. ████████████████████████████████████████████ ████████████████████████████████████ Sheriff Johnson testified he approached Williamson, Jr., put his hand on his shoulder and said, "Look, you need to leave. This is going to get out of hand." Trial Tr., 7:25-8:2. Johnson also said he was "not playing around" and would arrest Williamson, Jr. if he did not leave. Trial Tr., 8:6–7. When Williamson, Sr. approached the sheriff, Sheriff Johnson also told him to leave. Trial Tr., 8:16. Ultimately, Sheriff Johnson told both Williamsons to leave several times. Trial Tr., 9:13–15. The Williamsons did not comply and only left after Wells' arrest. Trial Tr., 27:5–16, 9:24–25, 25: 9–10, 33:12–21.

After speaking to Williamson, Sr., Sheriff Johnson turned to Wells and said: "Son, quit ringing the bell or you're going to jail. It's time to disperse." Trial Tr., 8:19–21. Wells said he was going to keep ringing the bell and singing and told the Sheriff, "Take me to fucking jail." Trial Tr., 9:2–3,29:17–20. Sheriff Johnson then reached for and grabbed Wells' arms and said, "Okay, you are under arrest." Johnson Case Suppl. Report; see also Dockery Case Suppl. Report ("the sheriff decided to place Maurice under arrest"); ASCO Deputy Brown Case Suppl. Report, Summary Judgment Motion Exhibit D ("Brown Case Suppl. Report") ("I heard Sheriff Johnson tell [Wells] that he was under arrest.").

Sheriff Johnson pulled Wells away from the bell and out of the crowd. Trial Tr., 9:3–4. Wells was charged with Disorderly Conduct (N.C. GEN. STAT. § 14-288.4 (2023)) and Failure to Disperse (N.C. GEN. STAT. § 14-288.5 (2023)). Summary Judgment Motion Exhibit E, Magistrate Order.

3

Immediately after Wells' arrest, Sheriff Johnson answered questions about why he arrested Wells. Cell Phone Video 1 at 00:43–01:26, submitted to the Court via thumb drive as Summary Judgment Motion Exhibit F ("Video 1"). Lindsay Ayling recorded Sheriff Johnson's explanation that Wells was arrested because he did not leave and used language that "was not decent." *See* Affidavit of Lindsay Ayling, ¶ 3, Summary Judgment Motion Exhibit G.[1] Deputy Brown, standing next to Sheriff Johnson, explained the arrest saying, "He was told numerous times to watch his language." Video 1. A protester asked, "[Y]ou can arrest people for language?" and Sheriff Johnson responded, "Yes ma'am." Video 1, 01:13–02:00; *See also*, Johnson Dep., pp. 65–67. Deputy Brown gave this same explanation in testimony at Wells' district court trial. Trial Tr., 41:5 ("[H]e was told him (sic) to watch his language."); 43:19–20). The day after the protest, at a meeting of the Alamance County Young Republicans, Sheriff Johnson again explained the reasons for Wells' arrest: "You cannot cuss. You can't F this and F that. That is disorderly conduct." Cell Phone Video 2, submitted to the Court via thumb drive as Summary Judgment Motion Exhibit H ("Video 2"[2]). *See also*, Johnson Dep., pp. 66–68.

Wells was convicted of the two misdemeanor charges on March 24, 2021, after a bench trial by the Honorable Lunsford Long, Alamance County District Court Judge presiding. Exhibit A. Sheriff Johnson testified at the trial. Wells' appeal *de novo* to Superior Court is currently pending and awaiting a court date.

---

[1] Dr. Ayling has provided an affidavit authenticating that the video attached to the Complaint and provided to the defendant in discovery reflects what she saw, is true and correct, and has not been altered. Exhibit G Ayling Affidavit, ¶ 14.

[2] Video 2 was downloaded from the Facebook page of the Alamance County Young Republicans. (*See* https://www.facebook.com/AlamanceYR/videos/746231386187436). At his deposition, Sheriff Johnson testified that the recording "sounded like my voice" and that he did not have any reason to think it was not his voice or words. Johnson Dep., 68: 18, 21–25, 79.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." *United States v. 8.929 Acres of Land in Arlington Cnty., Va.*, 36 F.4th 240, 252 (4th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)). Wells seeks summary judgment based primarily on the facts elicited from Defendant, in his sworn testimony at the misdemeanor trial, his deposition, admissions and other information obtained during discovery.

## ARGUMENT

Wells is entitled to summary judgment because the undisputed facts show that Sheriff Johnson, acting under color of state law, abridged Wells' First Amendment rights by arresting him for expressing his views at a political protest. *See* 42 U.S.C. § 1983. Because Wells' speech did not constitute fighting words, and there was no valid dispersal order, Sheriff Johnson's arrest of Wells was unconstitutional.

### I.  *Sheriff Johnson Acted Under Color of State Law When He Arrested Wells.*

Johnson admits that he is the constitutionally elected Sheriff of Alamance County, North Carolina, serves as the chief policymaker for Alamance County regarding law enforcement matters, and was acting under color of state law on July 11, 2010. DE 11, Answer, 8 ¶ 36.

Likewise, it cannot be disputed that Sheriff Johnson arrested Mr. Wells and that he acted under state law when doing so. An arrest is complete when "the person submits to the control of the arresting officer who has indicated his intention to arrest." N.C. GEN. STAT. § 15A-401(c)(1) (2023). The Sheriff twice has stated that he arrested Wells, telling him "you are under arrest" and physically removing him from the crowd.  Johnson Suppl. Report; ███████████████████

████████████████████████████████████ In his Supplemental Arrest

5

Report, Sheriff Johnson also wrote that he "grabbed Wells' arms" and told him "[o]kay you are under arrest." Johnson Suppl. Report. It is also undisputed that Wells submitted to the Sheriff's control and that Johnson physically removed him from the crowd. Johnson Suppl. Report.

## II. *Wells was engaged in constitutionally protected speech and expressive activity prior to his arrest.*

Without quesiton, Wells was engaged in speech on matters of public concern when Defendant arrested him. Speech addresses matters of public concern when "it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,'" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)). Speech about public affairs is "more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964). For this reason, speech "at a public place on a matter of public concern . . . is entitled to 'special protection' under the First Amendment." *Snyder*, 562 U.S. at 458; *see also Connick*, 461 U.S. at 145 (speech on public issues "occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection") (internal quotations omitted). In a traditional public forum such as a town square, "the government's ability to permissibly restrict expressive conduct is very limited." *United States v. Grace*, 461 U.S. 171, 177 (1983).

It is axiomatic that the government cannot restrict speech merely because it is vulgar or offensive to the audience. *See Cohen v. California*, 403 U.S. 15, 22–23 (1971) (overturning disorderly conduct conviction based on "Fuck the Draft" taped to defendant's jacket); *Boos v. Barry*, 485 U.S. 312, 322 (1988) ("[C]itizens must tolerate insulting, and even outrageous, speech in order to provide adequate 'breathing space' to the freedoms protected by the First Amendment."). Speakers are entitled to use words such as profanity for their "emotive" force. *Cohen*, 403 U.S. at 26. As the Supreme Court has recognized, one person's vulgarity is another's

6

lyric, which is why "the Constitution leaves matters of taste and style so largely to the individual." *Id*. at 25; *accord Iancu v. Brunetti*, 588 U.S. 388, 420 (2019) (Sotomayor, J., concurring in part and dissenting in part) (opining, regarding the "FUCT" trademark, that "without the profanity, the message is not quite the same"). Especially on matters of public concern, speech "cannot be restricted simply because it is upsetting or arouses contempt." *Snyder*, 562 U.S. at 458; *Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("[A] bedrock principle underlying the First Amendment . . . is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."). Fundamentally, the First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Snyder*, 562 U.S. at 452 (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 354, 269 (1964)).

Here, Sheriff Johnson arrested Wells for nothing more than his constitutionally protected political speech and expressive activity. According to Defendant's testimony, Wells uttered the following words and phrases at the protest: ███████████████████████████

███████████████████████████████████████████

███████████████████████ "Take me to fucking jail" (Trial Tr., 9:3); "[I am] going no fucking where" (Trial Tr., 29:18); and "I'll ring that mother fucking bell" (Summary Judgment Motion Exhibit I, Misdemeanor Statement of Charges). Wells' use of the words "damn," "fucker," or "fucking" do not exclude his speech from First Amendment protection. *See Cohen*, 403 U.S. at 22-23 (noting that California cannot excise "one particular scurrilous epithet from the public discourse") . In the context of the protest, "fucker" and "fucking" expressed the intensity of Wells' feelings about ringing the bell as a symbol of protest or about his impending arrest. *See id.* at 25 ("That the air may at times seem filled with verbal cacophony is, in this sense not a sign of

weakness but of strength."). And while Wells' words and bell ringing might have fallen short of "refined political commentary," they highlighted issues important to the community—e.g., whether Black Lives Matter protesters were equally entitled as ACTBAC to ring the old courthouse bell, or whether protesters could equally lay claim to the idea of justice that the old bell represents. *See Snyder*, 562 U.S. at 454 (holding that signs at protest stating, "God Hates Fags," "Not Blessed Just Cursed," "You're Going to Hell," and "God Hates You" plainly related to public issues).

Under the circumstances, ringing the bell was protected by the First Amendment because of its "expressive, overtly political" nature. *See Johnson,* 491 U.S. at 406 (holding that flag burning at a protest was protected expressive conduct). The entire protest and counterprotest on July 11, 2020, involved speech of "political [or] social...concern to the community." *Snyder*, 562 U.S. at 453. Further, because Wells was a participant in the BLM demonstration and rang the bell after ACTBAC rang it throughout the BLM speeches, his conduct was likely to be understood by objective observers as political. *See Johnson*, 491 U.S. at 406 (noting that the "expressive, overtly political nature" of conduct at a political protest "was both intentional and overwhelmingly apparent").

Finally, there is nothing in the record to suggest that Wells was physically aggressive, impaired by drugs or alcohol, carrying a weapon, or engaged in any other activity to prompt his arrest, except speaking and ringing the bell. Video 1 (explaining that Wells was arrested because he used language that "was not decent"); Video 2 (explaining that Wells was arrested because "You cannot cuss. You can't F this and F that. That is disorderly conduct."). In other words, Sheriff Johnson arrested Wells because of indecent speech, including "cuss" words, but the offensiveness of Wells' words do not justify his arrest. *See Johnson*, 491 U.S. at 408–09 (noting that speech

8

"may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger").

In summary, Wells was engaged in constitutionally protected political speech and expressive activity when he was arrested. Such speech is at the very heart of the First Amendment's guarantees and deserves special protection. *Snyder*, 562 U.S. at 452. Instead of protecting Wells' right to engage in such speech, Sheriff Johnson arrested him, thereby abridging Wells' First Amendment rights.

### III. *Defendant's Testimony Establishes That Plaintiff's Speech Was Not Fighting Words*

After his arrest, Wells was charged for and convicted of misdemeanor disorderly conduct for using "abusive language which is intended and plainly likely to provoke violent retaliation and thereby cause a breach of the peace." N.C. GEN. STAT. § 14-288.4 (2023). The statute has been narrowly construed to apply only to fighting words—language "likely to provoke ordinary men to violence." *State v. Summrell,* 192 S.E.2d 569, 576 (N.C. 1972), *overruled on other grounds sub nom*, *State v. Barnes*, 380 S.E.2d 118 (N.C. 1989). Relying exclusively on Sheriff's sworn testimony at the misdemeanor trial, his deposition, or other information obtained during discovery, this Court can find, as a matter of law, that Wells' language did not amount to fighting words.

The Supreme Court has described a "narrowly limited" class of speech, known as fighting words, that is not protected by the First Amendment. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571 (1942). Fighting words are "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Id*. at 572; *see also United States v. Bartow*, 997 F.3d 203, 207 (4th Cir. 2021). Fighting words comprise "no essential part of any exposition of ideas" and have "slight social value." *Chaplinsky, 315 U.S.* at 572. Because fighting words comprise a narrow exception to the otherwise broad protections of the First Amendment, it is the "rare case in which

9

that demanding standard has been met." *State v. Liebenguth*, 250 A.3d 1, 17 (Conn. 2020); *see also Sandul v. Larion*, 119 F.3d 1250, 1255 (6th Cir. 1997) (noting that the fighting words exception is "very limited" because "inconsistent with the general principle of free speech").

Since *Chaplinsky*, the Supreme Court has "sharply curtailed the reach of the 'fighting words' exception," and "has not upheld a criminal conviction under the doctrine since *Chaplinsky* itself." *Bartow*, 997 F.3d at 208, 211. It has effectively eliminated the "inflict injury" part of the rule, *id.* at 207, permitting the government to prosecute speech only if it is "likely to produce a clear and present danger of a serious substantive evil." *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949). Specifically, fighting words are limited to "direct personal insults"—statements clearly "directed to the person of the hearer," who is "actually or likely to be present." *Johnson*, 491 U.S. at 409; *see also Cohen*, 403 U.S. at 20; *Cantwell v. Connecticut*, 310 U.S. 296, 309–10 (1940). Without evidence of a "direct personal insult," the Government may not obtain a conviction for fighting words. *Bartow*, 997 F.3d at 207.

The Supreme Court also has clarified that the language used must be inherently likely to provoke immediate violent reaction; merely foul or indecent language is insufficient. *Cohen*, 403 U.S. at 21 (holding that public display of "Fuck the Draft" was not fighting words); *see also State v. Rosenfeld*, 303 A.2d 889, 891 (N.J. 1973) (setting aside conviction of man who said, at a school board meeting, "if we Whites didn't do something about the problem 'then the Mother F......ing town, the M.F. county, the M.F. state and the M.F. country would burn down'"). The use of the "f-word" in and of itself is not criminal conduct, *Sandul*, 119 F.3d at 1255, and courts have been reluctant to apply the fighting words exception to insults, profane statements, and even some threats. *See, e.g.*, *State v. Baccala*, 163 A.3d 1, 4 (Conn. 2017) (stating that a woman did not use fighting words when she called store employee a "fat ugly bitch" and "cunt" and said "fuck you,

you're not a manager" while raising her cane toward the employee); *State v. Tracy*, 130 A.3d 196, 198 (Vt. 2015) (finding that a father did not use fighting words when he approached his daughter's coach in her car, leaned forward with his hands in the car, and while only 12–14 inches away asked "Why can't you put her in a game for one f'ing minute" and called the coach a "bitch").

Instead, the language used by the speaker must be "so inflammatory" that "in the context in which it is uttered . . . it is akin to dropping a match into a pool of gasoline." *Tracy*, 130 A.2d. at 210. The "classic case" of "fighting words" occurs when racial slurs and epithets are used to insult someone of a different racial group. *In re Spivey*, 480 S.E.2d 693, 698 (N.C. 1997). To illustrate, in *Liebenguth*, Connecticut's highest court sustained the defendant's conviction for breach of the peace, based on the defendant's "repeated" use of the word n****r to a Black police officer, the defendant's "menacing invocation" of recent events in Ferguson, Missouri, his offensive and irate body language, and testimony from the officer that he had recognized the language as a threat that was intended to "rile him up" and provoke a violent reaction. 250 A.3d at 7.

But even using a despicable racial slur does not automatically equate to fighting words. There is no *per se* category of fighting words because words "likely to provoke an immediate, violent response when uttered under one set of circumstances may not be likely to trigger such a response when spoken in the context of a different factual scenario." *Id.* at 700; *see also Johnson*, 491 U.S. at 409 (requiring examination of context); *R.A.V. v. St. Paul,* 505 U.S. 377, 432, (1992) (Stevens, J., concurring) ("[w]hether words are fighting words is determined in part by their context"); *Spivey*, 480 S.E.2d at 699 (explaining that the circumstances surrounding the defendant's verbal outbursts tended to show the racial epithet was intended to provoke a confrontation. Instead, the government must offer "compelling evidence" that demonstrates all

11

the demanding requirements of the fighting words doctrine—that the words were a direct personal insult, likely to provoke an immediate violent reaction from the person to whom it was addressed, and the circumstances were particularly conducive to violence. *Bartow*, 997 F.3d at 210–11. This includes evidence that the language was "likely to provoke a violent reaction . . . by the person to whom, individually, [it was] addressed," *Id*. at 211 (quoting *Mercer v. Winstead*, 199 S.E.2d 724, 725 (Va. 1973)). Proximity of speakers is one factor that can suggest the likelihood of an immediate violent response from the person to whom a slur is addressed. *Johnson*, 491 U.S. at 409 (fighting words are those that, under the circumstances, amount to a direct personal insult or invitation to exchange fisticuffs); *see also Gooding*, 405 U.S. at 528; *Chaplinsky*, 315 U.S. at 573 (upholding fighting words conviction under statute that prohibited "face-to-face words plainly likely to cause a breach of the peace"); *State v. Authelet*, 385 A.2d 642, 649 (R.I. 1978) ("Unless there is personally abusive language which is likely to lead to imminent retaliation in a face-to-face encounter, words cannot be proscribed under Chaplinsky's fighting words approach.").

But even when the speaker and listener are close together, a racial slur might not be fighting words. In *Bartow*, the White defendant was convicted of using abusive language after calling two Black store employees "n****r." 997 F.3d at 206. The Fourth Circuit overturned the conviction, finding that the slur did not amount to fighting words because the circumstances did not show a likelihood of immediate violent response. The state had offered no witness testimony, including from the employees to whom the slur was addressed, suggesting that anyone who heard the word was likely to respond violently. *Bartow*, 997 F.3d at 210–11.

Here, the undisputed facts establish that the First Amendment protects all of Wells' language. Wells did not use abusive personal epithets such as racial slurs; his language was directed to the crowd in general, not to the Williamsons; and to the extent that it was directed at

12

the Williamsons, there is no evidence that the Williamsons were face-to-face with Wells and poised to respond violently. In fact, Johnson testified that the situation had calmed down when he arrested Wells.

Significantly, Defendant's descriptions of the specific statements made by Plaintiff have changed over time. Four days after the protest, the Sheriff reported that Wells said, "I am going to ring the motherfucking bell" and "Take me to fucking jail because I ain't stopping." Johnson Suppl. Report. About a year later, at Wells' district court trial, Sheriff Johnson testified similarly. Trial Tr., 29:18, 29:20, 10:19–20. Only after this lawsuit was filed did Johnson testify for the first time about specific statements that Wells allegedly directed toward the Williamsons. ███████

███████████████████████████████████████████████████████████████████

███████████████████████ But even accepting as true Johnson's most extreme description—that Wells said ███████████████████████████████████████████████████

███████ Wells' speech does not rise to the level of fighting words. The issue here is not whether Wells uttered playground insults and taunts but instead whether, under the circumstances, Wells' language arose to the "rare case" in which the "demanding standard" for fighting words has been met. *See Liebenguth*, 336 Conn. at 708. Wells' language, in the context of the protest, never arose to fighting words.

First, the language Wells used is, at its worst, vulgar and insulting. Such speech is protected by the First Amendment, and without other circumstances, does not amount to fighting words. *See, e.g.*, *Cohen*, 403 U.S. at 25; *Sandul*, 119 F.3d at 1255. Second, the circumstances surrounding Wells' language show that his words were neither directed at nor likely to incite an immediate breach of the peace. Wells was speaking at an animated protest that according to Sheriff Johnson had over 100 protesters present. Johnson Dep., 20:24; Trial Tr., 7:14. The situation was "[c]haotic

13

two sides yelling and screaming at each other." Trial Tr., 36:23. Multiple protesters and counterprotesters were yelling and shouting back and forth. Johnson Dep., 106:2–5. Under these circumstances, if Wells had been face-to-face with the Williamsons, yelling racial epithets at them, the Sheriff might have had reason to fear an immediate outbreak of fisticuffs. But the Sheriff's own testimony belies that fear.

It cannot be disputed that Wells' statements *about the bell* neither abused any individual nor provoked immediate violence. The ACTBAC counterprotesters had been ringing the old courthouse bell throughout the BLM protest, Trial Tr., 32:4–25, 37:10–12, and at the end of the event, protesters argued with counterprotesters over the bell. Trial Tr., 42:7. ███████████ ████████████████████████████████████████████████████████ Wells said "I'm gonna ring the motherfucking bell," Johnson Suppl. Report, and "this is our motherfucking bell." Trial Tr., 38:5, 41:25. The plain language of Wells' words about the bell contained no statements about any person, thus his language could not have directly insulted or personally abused anyone. *See Cohen*, 403 U.S. at 20. Further, Wells directed this language "at the crowd, the counter-protesters." Trial Tr., 41:16–19, 41:25–42:1. While yelling about the bell may have caused "annoyance, or unrest," that reaction falls short of creating a "clear and present danger" of an immediate violent response. *Terminiello*, 337 U.S. at 4. To the contrary, Johnson described that the two sides of the crowd █████████████████████████████████ Thus, Wells' language about the bell was vulgar, but not fighting words.

Johnson's most extreme description of Wells' language—his testimony that Wells yelled ████████████████████████████████████████████████████ likewise does not amount to fighting words. ████████████████ This statement was not a personally abusive epithet inherently likely to provoke immediate violent reaction. *See Cohen*, 304 U.S. at 20. It

14

should go without saying that calling someone a ████████████████ is less insulting than

using a racial epithet, such as n****r. *See Bartow*, 997 F.3d at 208 ("It is hard to think of an

English term that is more abhorrent."). And while ████████████████ may be an offensive

taunt, it is not so insulting that it would provoke the ordinary person to respond violently. *See*

*Rosenfeld*, 62 N.J. at 601. In fact, Deputy Brown wrote in his supplemental report that it was the

bellringing that caused counterprotesters to return to the area of the bell. Brown Case Suppl. Report

("[T]he protesters moved into Centennial Park and began to ring the bell. This caused that (sic)

counter protesters that were still milling about to come back.").

      Finally, an imminent violent reaction was highly unlikely under the circumstances. It is

undisputed that Wells did not throw anything and had no weapon. Johnson Dep., 50:19–20, 50:24–

25–51:1–3. ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ At the district court trial, Detective Kenneth Brown similarly

testified that Wells did not touch anyone or get close to anyone like he was going to fight. Trial

Tr., 42:8–10. And Johnson testified at his deposition that the Williamsons had calmed down by

the time that he arrested Wells:



███████████████████████ These facts can be contrasted with *Liebenguth*, in which the defendant repeatedly called a Black police officer a n****r among other threats, displayed angry body language, and the officer testified that he understood the language as a threat intended to com"rile him up" and provoke a violent reaction. 250 A.2d at 7. By contrast, Sheriff Johnson admits that when he arrested Wells, the Williamsons were calm — "everyone was calm." Significantly, the state did not produce evidence at trial that the Williamsons perceived Wells' words to be a threat intended to provoke them to violence. Wells' words lacked the bite to incite violence, especially considering his physical distance from the Williamsons and the comparatively mild epithet ██████████████ he used.

Even when accepting as true all of Sheriff Johnson's descriptions of Wells' language and behavior, Wells never used fighting words. He never used direct personal insults in face-to-face encounters that were "akin to dropping a match into a pool of gasoline." *Tracy*, 200 Vt. at 237. At worst, he caused annoyance or anger, but the fighting words doctrine demands more. This is not one of the rare cases of fighting words.

## IV.    *Sheriff Johnson did not issue a valid dispersal order as a matter of law.*

As a matter of law, Wells cannot be guilty of failure to disperse, because Sheriff Johnson did not issue a valid dispersal order. Under state law, a law enforcement officer may issue a command to disperse "if he reasonably believes that a riot, or disorderly conduct by an assemblage of three or more persons, is occurring. The command to disperse shall be given in a manner reasonably calculated to be communicated to the assemblage." N.C Gen. Stat. § 14-288.5(a). A valid dispersal order generally requires amplification and other methods that ensure the order is conveyed to the assemblage. *See State v. Brooks*, 215 S.E.2d 111, 114, 115 (N.C. App. 1975) (command to disperse lawful when officer used a bullhorn, told the crowd that it had five minutes

to leave, and waited five minutes before arresting defendant); *Adams v. City of Graham*, 2024 WL 888732, at *2 (M.D.N.C. 2024) (dispersal order valid when law enforcement ordered protesters to disperse twice, 20 minutes apart, used sound cannons on the second order, and physically moved the protesters).

Indeed, the ACSO's own Operation Plan for the July 11, 2020, Monument Protest/March details how the Sheriff's Office would announce any needed dispersal order. Johnson Dep. Exhibit 15, Summary Judgment Motion Exhibit J (hereinafter Operation Plan). The protocol states, "This warning is to be used when preparing to make arrests in civil disturbances." Operation Plan, p. 12. First, an officer was to announce his name and rank with the Alamance County Sheriff's Office and to state the statutory violation at issue. The officer then must give the directive: "If you do not cease your unlawful behavior at (Exact Location) and disperse peacefully, you will be arrested. The following routes of dispersal are available: (Provide Exact Routes). You have 5 minutes to disperse." Operation Plan, p. 12. The warnings are to be given three times, waiting minutes between each delivery. Operation Plan, p. 12. "Warnings should be given with either a bullhorn or a public address system, and must be given in a loud and clear manner. All warnings should be documented with ACSO in car camera systems." Operation Plan, p. 12. Sheriff Johnson has produced no documentation of any valid dispersal order given pursuant to these instructions, because no such dispersal order ever was issued.

Additionally, for a dispersal order to be valid, it must be predicated on an officer's reasonable belief that disorderly conduct was occurring by an assemblage of three or more persons. *State v. Thomas*, 221 S.E.2d 749, 750 (N.C. App. 1976); *State v. Clark*, 206 S.E.2d 252, 254 (N.C. App. 1974) (involving a group of 30–40 people). The underlying disorderly conduct includes violence, an imminent threat of violence, or language amounting to fighting words, but an officer

cannot issue a lawful dispersal order "merely because the group becomes noisy, or because its ideas and manner of protest alarm or disturb listeners or because a 'physically offensive' condition is thereby deemed to exist." *Fuller v. Scott*, 328 F. Supp. 842, 852 (M.D.N.C. 1971). Finally, a dispersal order is not appropriately directed at individuals. *See Thomas*, 221 S.E.2d at 750.

Sheriff Johnson has described his so-called dispersal order in a variety of ways. In the district court trial, Sheriff Johnson testified that he said, "Please leave. The permit ended at 3:00 o'clock. We don't need any problems here. You're only causing problems and costing the taxpayers money." Trial Tr., 9:20–22. He testified, "I was just basically begging them to be peaceful. They want to protest, protest peacefully." Trial Tr., 15:3–5. Sheriff Johnson had never issued a dispersal order before July 11, 2020, Johnson Dep., 48:23–25–49:1–2, and in his deposition, he described that he simply "hollered" to the crowd around him, Johnson Dep., 55:3–4, 33:4. He did not use a bullhorn. Johnson Dep., 33:4–9. He also testified that his language was aimed at "the two catalysts" at the protest.

What Sheriff Johnson described was not a valid dispersal order, because the order he gave was not "reasonably calculated to be communicated to the assemblage." N.C Gen. Stat. §14-288.5(a). To the degree Sheriff Johnson's language even could be described as an order to disperse, that order was given to Wells and the Williamsons, not the assemblage at large. Sheriff Johnson testified that he said *to Wells*, "Son, quit ringing the bell or you're going to jail. It's time to disperse." Trial Tr., 8:19–21. Sheriff Johnson did not order the broader assemblage of people to disperse, other than to request, with his unamplified voice, "please leave" -- words that clearly departed from ACSO protocol. Operation Plan, p. 12. In his deposition, Johnson repeatedly said his dispersal language was aimed at the catalysts at the protest, saying, "I did not have a bullhorn at that time, but the two catalysts definitely heard it several times." Johnson Dep., 33:7–9. A

dispersal order is not valid if it is only directed at two people, regardless of whether they are seen as the catalysts. Rather, it must be directed at the entire assemblage of people, or at a minimum of three people. *See* N.C. GEN. STAT. §14-288.5(a) (2023).

Additionally, Sheriff Johnson did not have reasonable grounds to believe that disorderly conduct was occurring by an assemblage of three or more people. █████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████ Johnson's testimony shows that in reality, his so-called dispersal order was directed at one person, not at an assemblage of three or more people. Because his belief of imminent disorderly conduct was only directed towards Wells, Sheriff Johnson did not have reasonable grounds to issue a dispersal order.

## CONCLUSION

Maurice Wells is entitled to have summary judgment entered in his favor. The undisputed facts show that Sheriff Johnson, while acting under color of state law, unconstitutionally abridged Wells' First Amendment rights by unlawfully arresting him, stopping his exercise of his rights of free speech and assembly. Sheriff Johnson cannot justify the arrest, because Wells' speech did not constitute fighting words, and there was no valid dispersal order.

19

Respectfully submitted this 3rd day of April 2024.

**FIRST AMENDMENT CLINIC**
**DUKE LAW SCHOOL**
Attorneys for Plaintiff
/s/ Sarah Ludington, Esq.
Sarah Ludington
N.C. State Bar No. 19997
ludington@law.duke.edu

C. Amanda Martin
N.C. State Bar No. 21186
amartin@law.duke.edu
Telephone: 919.613.7048
Fax: 919.613.7262
210 Science Drive
Durham, NC 27708

**NELSON MULLINS RILEY &**
**SCARBOROUGH LLP**
Cory Patterson
N.C. State Bar No. 39973
One Wells Fargo Center
301 South College Street
23rd Floor
Charlotte, NC 28202
Phone 704.417.3154
cory.patterson@nelsonmullins.com

Lorin J. Lapidus
N.C. State Bar No. 33458
Phone: 336.774.3329
lorin.lapidus@nelsonmullins.com

Chelsea K. Barnes
N.C. State Bar No. 53378
380 Knollwood Street, Suite 530
Winston-Salem, NC 27103
Phone: 336.774.3397
chelsea.barnes@nelsonmullins.com

20

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on April 3, 2024 the foregoing *Plaintiff's Memorandum in Support of Motion for Summary Judgment* was filed electronically with the Clerk of the United States District Court for the Middle District of North Carolina using the CM/ECF system which will send notification of this filing and an electronic copy of the same to all counsel of record registered with the CM/ECF system.

This the 3rd day of April, 2024

FIRST AMENDMENT CLINIC
DUKE LAW SCHOOL
Attorneys for Plaintiff
/s/ Sarah Ludington, Esq.
Sarah Ludington
N.C. State Bar No. 19997
ludington@law.duke.edu